CHARLES HANNEMAN ET AL., APPELLEES V. OSCAR P. OLSON ET AL., APPELLANTS.

FILED DECEMBER 8, 1925. No. 23335.

1. **Evidence: PAROL EVIDENCE.** "The distinction in point of law is that evidence to vary the terms of an agreement in writing is not admissible, but evidence to show that there is not an agreement at all is admissible." *Pym v. Campbell*, 6 Ell. & Bl. Q. B. (Eng.) *370.

2. ——: ——. "Parol evidence is admissible, in an action between the parties, to show that a written instrument, executed and delivered by the party obligor to the party obligee, absolute on its face, was conditional and was not intended to take effect until another event should take place." *Ware v. Allen*, 128 U. S. 590.

3. **Fraud: SUFFICIENCY OF EVIDENCE.** Upon examination of the evidence, we conclude that the verdict of the jury is amply supported thereby.

APPEAL from the district court for Douglas county: ARTHUR C. WAKELEY, JUDGE. *Affirmed.*

*Smith, Schall, Howell & Sheehan, A. F. Mullen* and *V. H. Johnson*, for appellants.

*McKenzie, Lower & Sheehan*, contra.

Heard before MORRISSEY, C. J., DEAN, DAY, GOOD, THOMPSON and EBERLY, JJ.

DEAN, J.

The plaintiffs Hanneman are brothers, residing at Mag-

nolia, Iowa, where they were formerly engaged in the farm implement, hardware, and automobile business. They commenced this action in the district court for Douglas county to recover damages for an alleged fraud said to have been perpetrated by defendants in the sale of a certain tract of eastern Colorado land to them, and in this they allege they were damaged in the sum of $63,200, for which they sought to recover judgment. Upon submission of the evidence, plaintiffs recovered a verdict, and judgment thereon, for $43,560, this sum including lawful interest on the indebtedness up to the date of the verdict. Defendants have appealed.

It may here be observed that this action involves a consideration of two land sale contracts between the parties. The first contract is dated October 21, 1919, and has to do with land designated in the record as the "Frost tract," consisting of approximately, 2,880 acres, for which the purchase price was $35 an acre, or a little over $100,000 in all. On this contract plaintiffs paid $5,800 on the date of purchase. The second sale contract, dated December 20, 1919, has to do with another tract of land, consisting of about the same number of acres and at about the same price. The first tract having been subsequently exchanged for the second tract, the above payment of $5,800 was applied thereon as a part payment. The contract in suit also obligated plaintiffs to deliver to defendants a certain stock of implements, hardware, automobiles and accessories, then at Magnolia, Iowa, or so much thereof as was necessary to pay out the unpaid remainder of the purchase price. This stock of merchandise was owned by plaintiffs and was valued at approximately $28,000 or $30,000, at wholesale prices.

Before the contract for the Frost tract was closed, plaintiffs made a thorough examination of the land and found a body of "about 1,100 acres of wheat" coming up at the time, and they noted that the farm equipment, of the then supposed former owner, consisted of "four or five tractors, a plow for each tractor, a couple of discs, a couple of drills, a tank wagon" and other implements, all of which tended to show that it was a fertile and producing farm.

When the contract for the Frost tract was entered into, plaintiffs were strangers in Colorado and had been but a few days in the vicinity of the land. And it appears that, from the time of their arrival until their departure, they were constantly in the company of defendants and their agents, and among the latter were Swanson, Stout, and Armstrong. On this point Homer Hanneman testified: "Q. You may tell who was with you during the time you were there from the time you hit Burlington, Colorado, until the time that they put you on the train. * * *A. There was always Mr. Olson, or Mr. Swanson, Mr. Stout, or Mr. Armstrong with us all the time." So that from this evidence the jury doubtless concluded that plaintiffs had little opportunity to make an independent inquiry and investigation of other Colorado lands in respect to soïl composition, value, quality, productivity, and the like. And it appears from the evidence that, while plaintiffs were being driven to the railroad station, accompanied by some of the vendors and their agents, preparatory to returning to their Iowa home, a farmer named Rudolph was sighted "100 or 150 yards away," and that "Mr. Swanson got out of the car and started to walk ahead of us and talk to Mr. Rudolph a little while before we got there." When Swanson and Rudolph came to the car, the latter told plaintiffs that the Frost tract was worth "about $60 to $65 an acre." In respect to this incident, Mr. Rudolph testified that Swanson had a talk with him "separate and apart from Hanneman brothers," and that he, Swanson, told him "to price this land at $65 an acre—big deal on." And this Rudolph did.

About two months after plaintiffs bought the Frost tract, or believed they had bought it, they were called up by telephone at their Iowa home from Missouri Valley, by one of defendants' agents, and informed that, owing to the then recent death of the late owner of the land which they had bought, the title thereto was in such condition that it would take at least a year, by appropriate court proceedings, to make the title merchantable. Plaintiffs then, by appointment, went to Omaha, taking Mr. Stirtz, a brother-in-law,

along, where the party met Olson, Swanson, and Stout, by whom an exchange of the Frost land was proposed for another 2,880-acre tract of Colorado land, which, they were then informed, was owned by defendants, and which they were willing to sell at approximately the same price which was paid for the Frost land. This tract was a considerable distance from the Frost tract, and was represented by defendants to be several miles nearer town and well improved, and a better tract than the one they had purchased in many material respects.

At first plaintiffs expressed an entire unwillingness to consent to an exchange of land for other land which they had never seen, and for a time they refused to even consider the proposition unless they were given time and opportunity for examination. But in this resolve, as disclosed by competent evidence, plaintiffs were overborne by the representations made by defendants and their agents, in respect of the value of the proposed tract and the like, and, in apparently implicit reliance on the representations so made, an exchange contract, or rather a new contract, for the purchase of the proposed tract was there entered into. It may here be noted that it afterward transpired that defendants never owned the Frost tract and the transaction proved to be only a pretended sale, though one of the vendors testified that they had a verbal agreement with the owner authorizing a sale.

In respect of the false and fraudulent representations, which induced the sale of the second tract, there is competent evidence, on this vitally material feature, tending to prove that defendants, by themselves and their agents, falsely represented to plaintiffs that a very large proportion of the 2,880-acre tract under consideration, namely, the second tract, was as smooth as a floor; that the soil was fertile; that it was free from sand and gravel; that it would produce 25 bushels of wheat to the acre and upward, and other crops in like proportion, and that some of it was sub-irrigated land which, for growing alfalfa, was easily worth $250 an acre. Defendants further informed plaintiffs that

they bought the land for $32.50 an acre and were willing to sell it for the slight advance of $2.50 an acre, or $35, and gave as a reason for selling that they had another tract of land which they wanted to retain, but that, solely for financial reasons, they were unable to keep both and were therefore willing to sell the land in question to plaintiffs even at a sacrifice. But there is evidence tending to prove that the land was bought by defendants shortly before, for less than half of the sum which they represented to plaintiffs they had paid for it.

Plaintiffs consulted Stirtz, and he advised them to make the exchange and to forego a personal examination. He, being a man of mature years, assured them, in substance, that he, Stirtz, had become informed in respect of Olson's standing, and that he was a reliable man, who could be depended on, and would scorn to make false representations in order to effect a sale or a trade. Naturally, plaintiffs listened to their brother-in-law, in whom they placed implicit confidence, and, in view of defendants' fraudulent representations and assurances, on which they relied, they yielded and the purchase was made. But it transpired that Olson had paid Stirtz $500 for his influence in getting plaintiffs to make the purchase without going to Colorado to examine the land. This was, of course, undiscovered by plaintiffs until some time after the sale was effected. And it may here be noted that proof was offered which tended to show that one of defendants' regular agents received almost $3,000 for his assistance in closing the deal, and that another was promised a like amount, or perhaps more; but it appears that he, for some reason, realized nothing for his efforts.

Plaintiffs, as noted, in reliance on the false and fraudulent representations of defendants and their agents, and in utter ignorance of the real facts, of which they were the victims, and in ignorance of the fact that their brother-in-law had been basely seduced by defendants, proceeded to invoice their farm implements, their hardware, their automobiles and accessories, which, as above noted, approximat-

Hanneman v. Olson.

ed $37,000 or $38,000 in value, and this, in addition to the $5,800 which was paid on the Frost tract, was delivered to defendants, and also mortgages for the remainder of the purchase price of the land.   Some automobile tires plaintiffs forwarded to Swanson, but the bulk of the merchandise was delivered to Olson.   In addition to the foregoing, one of the Hannemans testified:   "Q. Now, what was the approximate amount of the mortgages that you had given to Olson, Swanson, or other parties, on this land, in addition to the $38,000 you paid?   A. $62,000 or $63,000."

The truth in respect of the transaction was not discovered by plaintiffs until they went to Colorado the following spring and tried to farm the land in suit, but they found that the soil was sandy and so streaked with gravel that it could not be farmed, and was altogether an unproductive tract and was fit for grazing purposes only. They and other witnesses, produced by them, testified that the value of the smooth land which was sold to them was about $10 an acre, and the rough land, of which there was considerable, was worth about $7.50 an acre.   Other evidence was introduced which tended to prove that the land was worth about $16 an acre. But the question of value, and of the credibility of the witnesses as well, was for the jury.

In respect of defendant, D. R. Jones Land Company, the contention is that no liability attaches on the ground that Swanson, who was Jones' partner, exceeded his authority as a member of the firm.   In view of the evidence, the argument does not appeal to us.   In passing, it may be observed that the offices of defendant "Land & Cattle Company" and of defendant "D. R. Jones Land Company" are closely located in the same building, and certain features of the transaction were talked over in both offices between plaintiffs and defendants' agents.   But this is only an incident.   Jones, however, testified that the "D. R. Jones Land Company" was a partnership, consisting of himself, and his partner Swanson, and was located at Cheyenne Wells, Colorado.   A large folder, or poster, is in evidence which is a direct and persuasive invitation to purchasers

to invest in land in Cheyenne county, Colorado. Jones admitted that he knew the poster was generally circulated in the neighborhood of the land in suit and at other points. And the poster, which is really impressive in its makeup, designated the "D. R. Jones Land Company" as its sponsor. From all the evidence we conclude that the jury were justified in finding that this company was liable, with the other defendants, as an active participant in the transaction here in question.

Plaintiffs began a former action in Douglas county to recover damages. Defendants endeavored to bring about a settlement of the action, which in effect amounted to a dismissal, but plaintiffs refused to consider a dismissal until their money was returned to them. Subsequently, however, they did sign an instrument which, in terms, indicated that there was no suit pending, and this, solely on defendants' assurance that it would help them in their efforts to sell the land. Defendants' contention now is that this instrument constitutes an absolute dismissal by which plaintiffs are bound. But plaintiffs testified that they signed the proposed settlement agreement, or dismissal, above referred to, with an agreement on the part of defendants that it would be used solely to show to prospective buyers, and that it should not become effective until defendants returned their money which was wrongfully obtained, and this, for the very obvious reason that no person would consider a purchase of land which was involved in present litigation. On the cross-examination, in respect of the above-mentioned proposed agreement for settlement and dismissal, Swanson testified that he told plaintiffs, or one of them, that he was going to see defendants' attorney and have him "draw up an agreement along the line we had discussed, provided it met with his approval," and that plaintiffs "were to sign what we had agreed upon." Swanson further testified in respect of the instrument of dismissal that the Hannemans were "to be the judge whether it was what you had agreed upon."

It is well settled, in this and other jurisdictions, that such an agreement is enforceable. In *Gund v. Roulier*, 108

Hanneman v. Olson.

Neb. 589, on rehearing at page 595, it was held competent for parties to agree that certain conditions precedent were to be performed before the instrument, there in question, became a binding contract. And this appears to be a rule of long and respectable standing. In *Pym v. Campbell,* 6 Ell. & Bl., Q. B. (Eng.) *370, it was held, in a case wherein it had been agreed that a certain contract should not be binding until a third party's approval was obtained: "If it be proved that in fact the paper was signed with the express intention that it should not be an agreement, the other party cannot fix it as an agreement upon those so signing. The distinction in point of law is that evidence to vary the terms of an agreement in writing is not admissible, but evidence to show that there is not an agreement at all is admissible." See *Collingwood v. Merchants Bank,* 15 Neb. 118; *Coffman v. Malone,* 98 Neb. 819, L. R. A. 1917B, 258; *Davis v. Stearns,* 85 Neb. 121.

*Ware v. Allen,* 128 U. S. 590, is in point. The court there said:

"Parol evidence is admissible, in an action between the parties, to show that a written instrument, executed and delivered by the party obligor to the party obligee, absolute on its face, was conditional and was not intended to take effect until another event should take place." And it was further held that the contract, there in suit, never went into effect because the condition upon which it was to become operative never occurred, and that the case therefore came under the well-recognized rule, as stated, "By which an instrument, whether delivered to a third person as an escrow, or to the obligee in it, is made to depend, as to its going into operation, upon events to occur or to be ascertained thereafter." To substantially the same effect is *Golden v. Meier,* 129 Wis. 14.

Defendants excepted to certain instructions tendered by them, and refused by the court, and also in respect of certain instructions given by the court of its own motion. Upon examination we find that reversible error cannot be predicated upon these assignments of alleged error. The jury

were fairly instructed on every material fact involved in:
the controversy herein, and we find that the verdict is.
amply sustained by the evidence, notwithstanding it con--
flicts on every material point. The court did not err in
overruling the motion of defendants, and each of them, for·
a new trial.

Reversible error has not been pointed out. The judgment.
is therefore

AFFIRMED.

Note—See Evidence, 10 R. C. L. 1055—22 C. J. secs. 1459,.
1540, 1617.